```
 1              IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,     )
                                   )
 4                 Plaintiff,      )
                                   )
 5   -vs-                          )      Criminal Case No.
                                   )
 6   JONATHAN WOODS,               )      5:19-cr-20008-JEL
                                   )
 7                 Defendant.      )
     _____

 8

 9                            SENTENCE
              BEFORE THE HONORABLE JUDITH E. LEVY
10               UNITED STATES DISTRICT JUDGE
             Ann Arbor, Michigan - Friday, January 10, 2020
11

12   APPEARANCES:

13   FOR THE GOVERNMENT:    BLAKE HATLEM, ESQ.
                            United States Attorney's Office
14                          211 W. Fort Street, Suite 2001
                            Detroit, Michigan 48226
15                          (313) 226-9100

16   FOR THE DEFENDANT:     NATASHA D. WEBSTER, ESQ.
                            Federal Defender Office
17                          613 Abbott, 5th Floor
                            Detroit, Michigan 48226
18                          (313) 967-5542

19

20

21   REPORTED BY:           Darlene K. May, CSR, RPR, CRR, RMR
                            231 W. Lafayette Boulevard
22                          Detroit, Michigan 48226
                            (313) 234-2605
23

24          (Proceedings reported by mechanical stenography)
                   (Transcript produced by computer)
25
```

TABLE OF CONTENTS

WITNESSES:

    None

EXHIBITS:

    None

1          Friday, January 10, 2020

2          11:06 a.m.

3                          -- --- --

4          All rise.  The United States District Court is now in

5   session.  The Honorable Judith E. Levy presiding.

6          The court calls case number 19-20008.  The United

7   States of America versus Jonathan Woods.

8          Please be seated.

9          Counsel, put your appearances on the record.

10         MR. HATLEM:  Good morning, Your Honor.  Blake Hatlem

11  on behalf of the United States.

12         THE COURT:  Good morning, Mr. Hatlem.  And thank you

13  for standing in.  I understand Mr. Haugabook had a conflict

14  today.

15         MR. HATLEM:  That's correct, Your Honor.

16         THE COURT:  Okay.  And I hope he's doing all right.

17         MR. HATLEM:  I hope so as well.

18         THE COURT:  Okay.  Would you convey that to him for

19  me?

20         MR. HATLEM:  I absolutely will.

21         THE COURT:  Thank you.

22         MS. WEBSTER:  Good morning, Your Honor.  Natasha

23  Webster on behalf of Mr. Woods.

24         THE COURT:  Hi, Ms. Webster.

25         Welcome back, Mr. Woods.  Please be seated.

1     THE COURT:  This is the date and time that was set

2  aside for sentencing in this case, United States of America

3  versus Jonathan Woods.

4     And Mr. Woods as you remember, you pled guilty to

5  Counts One through Four and those charged you with wire fraud.

6  And you also pled guilty to Count Five in the indictment, which

7  is possession of 15 or more unauthorized access devices, and

8  you did so with a Rule 11 Plea Agreement.

9     At the time of your hearing, I accepted your plea of

10  guilty and you were adjudged guilty of those offenses.  Do you

11  wish to maintain that plea?

12     THE DEFENDANT:  Yes, ma'am.

13     THE COURT:  Okay.  And at the time of your plea

14  hearing, you were represented by Ms. Webster and then we were

15  back here with a violation of the terms of your pretrial

16  release and Ms. Webster was here with you then and, of course,

17  she's here today.

18     Have you had any problems with your relationship with

19  your lawyer that you think I should be aware of?

20     THE DEFENDANT:  No, ma'am.

21     THE COURT:  Okay.  And again, I didn't anticipate that

22  you would have -- the reason I ask that is you have a Sixth

23  Amendment constitutional right to the effective assistance of a

24  lawyer and it's my duty to safeguard that right.  So I always

25  ask that question.

1           So we'll now proceed with the sentencing hearing.  And
2   I've had an opportunity to review the presence report that
3   was actually prepared on December 1st and then revised on
4   January 2nd of 2020.
5           Mr. Hatlem, is that the report you're working from?
6           MR. HATLEM:  Yes, Your Honor.
7           THE COURT:  Does the government have any corrections,
8   changes, deletions?
9           MR. HATLEM:  We do not.
10          THE COURT:  Okay.  And Ms. Webster, that's the report
11  you're working from as well?
12          MS. WEBSTER:  Yes, Your Honor.
13          THE COURT:  Did you have an opportunity to share the
14  contents with your client?
15          MS. WEBSTER:  I did, Your Honor.
16          THE COURT:  Good.  And then there are a number of
17  objections that you've filed.  I think one of them was
18  resolved.  But have any of the other objections been resolved
19  or explained to you and your client's satisfaction?
20          MS. WEBSTER:  Yes, Your Honor.  We -- our first
21  objection, according to the addendum to the presence report,
22  we are withdrawing.
23          THE COURT:  Okay.
24          MS. WEBSTER:  That speaks to the use of the word
25  "goat."

1          THE COURT:  Exactly.

2          MS. WEBSTER:  We're withdrawing that objection.

3          THE COURT:  The second objection goes to your client

4  objecting to the sentence in the report indicating that he had

5  posted firearms on social media.  And Mr. Haugabook -- or did

6  you prepare the sentencing memo?

7          MR. HATLEM:  I did not.  It was Mr. Haugabook.

8          THE COURT:  He provided me a picture of an image from

9  the internet with cash with Mr. Woods with a firearm.

10          MS. WEBSTER:  Yes, Your Honor.  And Mr. Woods explains

11  to me that that is a replica.  That is not a -- he says it's a

12  BB gun.  It's not a real firearm.

13          I would just note that I have seen replicas that are

14  very convincing but I haven't seen any evidence, for example,

15  of a serial number or anything making it an authentic or a

16  firearm as defined under the statute or guidelines.  And it

17  doesn't have a bearing on the guidelines, but Mr. Woods wants

18  the Court to know that it was not real.

19          THE COURT:  I'm not an expert in firearms whatsoever.

20          Mr. Hatlem, I'm looking at Page ID 122 in the

21  government's sentencing memorandum.

22          MR. HATLEM:  Forgive me.  When you say page --

23          THE COURT:  The filing, page nine.

24          MR. HATLEM:  Oh, thank you.  Yes, Your Honor.  There's

25  also another image on page 13 of our guideline where he appears

1  to be holding another gun.

2  　　　　THE COURT:  Oh.  That's -- I thought that was a

3  telephone.  Okay.  Oh, yes, you're right.

4  　　　　Mr. Woods, are those weapons that are depicted on page

5  13 replicas?

6  　　　　MS. WEBSTER:  One moment, please, Your Honor.

7  　　　　MR. HATLEM:  Your Honor, I know the pictures are not

8  as clear.  Is the Court aware there are actually what appears

9  to be two guns in one picture?

10 　　　　THE COURT:  Exactly.

11 　　　　MR. HATLEM:  I didn't actually catch that myself the

12 first time.

13 　　　　THE COURT:  I don't have very good eyes.  But I see

14 one in Mr. Woods' pants pocket or something on the left-hand

15 side on page 13 as well as something in his hands.

16 　　　　MR. HATLEM:  If I can address that while they're ...

17 　　　　THE COURT:  Well, I want to make sure they can consult

18 with one another and also hear you.

19 　　(Pause.)

20 　　　　MS. WEBSTER:  Your Honor, we've consulted.  Upon

21 showing Mr. Woods the photo on page 13 on the left ...

22 　　　　THE COURT:  Yeah.

23 　　　　MS. WEBSTER:  We will withdraw the objection.

24 　　　　THE COURT:  Okay.  Now, is objection number three

25 regarding the inclusion of the reference to a credit card

1  skimmer, are you still pursuing that?

2          MS. WEBSTER:  Your Honor, that is an objection.

3  Because Mr. Woods maintains that this language in the text

4  messages that this was derived from was, basically, posturing.

5  That it was meant to make him look more credible with respect

6  to credit card fraud than in actuality.

7          THE COURT:  That's the way I understood it, too.

8  Which is why I didn't exactly understand the objection

9  because -- let me go to paragraph 13.  The way I understood it

10  is that Mr. Woods was puffing, so to speak, about his capacity

11  to do a great deal of fraud.  And he wanted people to think he

12  was personally getting the individuals' identities himself with

13  a skimmer when, in fact, he went on the dark web and just

14  bought them.

15          MS. WEBSTER:  Yes, Your Honor.  So as long as the

16  Court -- I think my client's concern is that the Court

17  understands him as portraying this and not actually having one.

18  I think that's kind of where the sticking point is.

19          THE COURT:  It says, "Woods portrayed himself

20  obtaining the PII, the personal identifying information, from

21  skimmers he left at gas stations that police departments

22  supposedly seized."

23          See, I never thought for a minute he did that.

24          MS. WEBSTER:  Okay.  Your Honor, in light of the

25  Court's commentary, we'll withdraw that objection.

1           THE COURT:  Okay.

2           Is the loss amount still in controversy?

3           MS. WEBSTER:  It is not, Your Honor.

4           THE COURT:  I didn't think so from your sentencing

5    memo.

6           And number five is resolved, I think.

7           MS. WEBSTER:  That's correct.  That's correct.

8           And number six, we are withdrawing.  I was able to

9    review the history of the testing and we addressed that with

10   the Court last time in December.  So we're moving on, Your

11   Honor.

12          THE COURT:  Okay, good.  Thank you.

13          Okay.  Well, as a result of what we have done so far,

14   I will accept the plea agreement itself.  And based upon the

15   information in the presentence report as well as having

16   reviewed the sentencing memos, the guidelines in this case,

17   Mr. Woods, I'm required to set forth what your sentencing

18   guidelines are.  Your offense level is considered a 16.  That

19   measures the seriousness of these offenses.

20          And your criminal history category is a two.  And that

21   means that the applicable sentencing guidelines are 24 to 30

22   months.  And that was what was estimated in your plea

23   agreement.

24          I'm aware that the guidelines are advisory and that I

25   have the authority to either depart or vary upward or downward

1   for reasons that I would set forth on the record.

2          I also want to mention that the presentence report was

3   prepared by Courtney Turner, but Jennifer Danish is here in his

4   place because he's unavailable.  I did have a chance to meet

5   with Mr. Turner by telephone earlier this week and also to meet

6   with Ms. Danish to review the contents of the report.

7          PRETRIAL SERVICES REPRESENTATIVE:  Your Honor, it's

8   Courtney Wilson.

9          THE COURT:  Courtney Wilson, not Turner.  Good.  Thank

10  you.

11         So I will now call upon the government to address the

12  Court on the sentence that you believe is appropriate here and

13  then Ms. Webster.

14         And then, Mr. Woods, after that, I'll turn to you and

15  you'll have an opportunity to speak on your own behalf, if you

16  want to.

17         THE DEFENDANT:  Yes, ma'am.

18         MR. HATLEM:  Should I use the lectern?

19         THE COURT:  I think that might be easier.  And I

20  should mention, which I think is already evident, that I have

21  read the sentencing memos that were submitted.

22         MR. HATLEM:  Thank you, Your Honor.  May I begin?

23         THE COURT:  Yes.

24         MR. HATLEM:  Your Honor, I'd like to begin by sort of

25  addressing what I think is maybe somewhat sidelined in this

1  case and which is verified is that there were actually real

2  victims that were part of what we're calling the starter

3  pack.

4  　　　　THE COURT:  Okay.

5  　　　　MR. HATLEM:  I talked with my agent this morning

6  because that was one of the issues.  As the Court is aware, I

7  have recently been assigned to this case, but I've immersed

8  myself in it in the last 36 to 48 hours.  I've spent pretty

9  much the majority of that time, as much as I could, learning

10 about the case.  And that was one of the first questions I had

11 is, did these people actually exist?  Were there 16 actual

12 people associated with that?

13 　　　　While they, apparently, were or have not themselves

14 been victims of the crime, it was their personal identification

15 information which was being disseminated out.  And I think that

16 that's important for the Court to know.  And I'm not going to

17 belabor the point.  I think everyone is well aware in our

18 society today the issues that come with identity theft and the

19 issues that the victims have when they are, in fact, subjected

20 to that.

21 　　　　One of the things that I would like to begin with,

22 Your Honor, is that as I was preparing for the sentencing

23 today, I looked on the internet, because there was these

24 references to the videos that he posted.  I was, frankly,

25 shocked to see they were still there.  They're still up on the

1    web.

2           And I looked at one of them called "Scamming is like

3    Art" video, which is very professionally done.  It's in an

4    interview setting where the defendant is sitting in an

5    interview with an individual who, apparently, interviews

6    rappers or people.  It was very professionally done.  I was

7    impressed with the quality of the video.  I was not as

8    impressed with the subject matter of the video which was,

9    essentially, him explaining how it is that he makes his money.

10   And bragging --

11          THE COURT:  How he makes his money through credit card

12   fraud.

13          MR. HATLEM:  Through credit card swiping.  It was not

14   about his rapping.  It was primarily almost exclusively about

15   scamming.  And almost, within the first 30 seconds, 45 seconds

16   in this interview, the interviewer confronts him with, "How is

17   it that you're talking about this?  How are you openly talking

18   about this?  Aren't you concerned about some day facing some

19   sort of justice?"

20          And his response is -- specifically, he was asked if

21   he was concerned about being indicted.  And he just chuckles

22   and says that he is way smarter than those people.  And then he

23   goes on to talk about what he calls the art.  And he describes

24   it, in fact, as an art.  And at one point refers to himself as

25   Osama Bin Scammer.

1            The Court knows all this from the sentencing

2   memorandum.

3            THE COURT:  Right.

4            MR. HATLEM:  I bring this point home to the Court

5   because there were 90,000 views of that video.  It's a pretty

6   substantial number to my mind for what I would consider to be a

7   fairly unintelligible or unintelligent topic heading for

8   someone to have 90,000 people viewing that.

9            And then I looked at after the indictment his

10   behaviors.  And I saw that he has released an album in

11   September of last year, 2019.  And he titles it "The United

12   States versus Self-Made Cash."

13            THE COURT:  He also has "United States versus Jonathan

14   Woods."

15            MR. HATLEM:  I did not know that.  I did not see that

16   one.

17            THE COURT:  Okay.  That's okay.

18            MR. HATLEM:  And in that there's some caricatures and

19   one of them appears to be this courtroom.

20            THE COURT:  It does.

21            MR. HATLEM:  And Your Honor's in it and Mr. Haugabook

22   and there's a goat at defense counsel table sitting next to

23   him.

24            MR. HATLEM:  I say these things --

25            THE COURT:  I don't know that Ms. Webster is in it.

1    MR. HATLEM:  She's not.

2    THE COURT:  I'm sorry, Ms. Webster.

3    MR. HATLEM:  Ms. Webster is not in it.

4    THE COURT:  I think the rest of us are in it.

5    MR. HATLEM:  Yes.  And so I say these things because

6 I'm not sure that even at this late stage that he understands

7 what he did.  And coming from a state court prosecutor position

8 for many years, when I first looked at this case, I will freely

9 admit that when I was first asked to look at it, I saw it and I

10 thought, well, this is a nonviolent offense.  I looked at the

11 guidelines.  I saw what they were.

12    But I realize why now it has been charged and indicted

13 as a federal offense.  And that is because of his behaviors in

14 encouraging and really -- I wouldn't say inciting, that's too

15 strong a word but engaging in people to permit this offense.

16 We know he succeeded in doing that in the sense that people did

17 direct message him and he gave them some information.  It

18 turned out to be faulty information because he's not as fluent

19 in this crime as he could have been, thankfully.

20    But, clearly, he had an impact on some people through

21 his social media presence.  But I would ask the Court to

22 consider the fact that of just those 90,000 people in that one

23 video, how many other people he could very well have influenced

24 and very well may have influenced who just didn't both to

25 direct message him.  But they were able to see the lifestyle

1  that he fronted, the large amounts of cash that he had.  All of

2  the things which he put out to world to say, "Hey, look this is

3  a great way to make easy money and look at me, I'm doing it and

4  I can teach you how to do it."

5           And I found that to be pretty upsetting, as I'm sure

6  that the Court did as well.  To our mind this case is a very

7  strong case for deterrence.  We are very concerned that a

8  sentence that does not involve incarceration for this

9  defendant, a term of imprisonment, would send the wrong

10  message, not only to him.  But broadly to the fact that there

11  is a following of his.

12           This case has been picked up in the press, which is

13  not the Court's concern, I understand that, but as I was

14  reading through it I did see that there has been people

15  following this case because of his status, the status he

16  created for himself.  Our position is that he deserves a term

17  of incarceration, not only to subject him to a penalty for his

18  behaviors in this case, subjecting the people who I would

19  consider the true victims, the 16 people who were in the

20  packet.  I'm much less concerned about the people who reached

21  out to him that he scammed who were trying to learn how to

22  become credit card scammers.  Those people are in a different

23  category.  But certainly, I am concerned about those people.

24           So there's a penalty aspect to this, but then there is

25  more importantly, to our mind, a deterrence aspect to it.  And

1    I understand the reality of his life, it has been difficult.  I

2    read through the sentencing memoranda that the defense has

3    filed.  I had already, obviously, the sentencing report.  It's

4    clear that he has faced some significant challenges in his

5    lifetime.  But I would also suggest to the Court that he has

6    been given some opportunities.  I look back  to when he was 16,

7    which is 10 years ago, which in the lifetime of a 16 year old

8    to 26 year old is an unbelievable breadth of time and I'm not

9    suggesting he is the same person he is today when he was 16.

10   When he was 16, he had a firearm and he shot another child at a

11   school.

12          He was put in intensive inpatient counseling.  It's as

13   strict punishment as you can give a juvenile offender in the

14   State of Michigan and then he was released through the Star

15   Commonwealth, which I know is a wonderful program.  So he was

16   given -- I would suggest to the Court, without knowing

17   firsthand, I would suggest he was probably given quite a few

18   tools during that period of time, which he could have used more

19   constructively than he has moving forward.  So I would suggest

20   that there has been at least a component of his previous

21   sentences where he has been given an opportunity to reform his

22   behavior and as of today's date he has not yet done that.

23          So it really brings us to where we are today.  The

24   government is requesting a 28-month sentence in this case which

25   is, to our mind, a fair sentence because not -- and again, I

1   did read -- like I said, I'll briefly just sum this up.  I was

2   appalled and I was angry at the videos, but as I read through

3   his prior history and I saw the issues and difficulties he had,

4   I did come away from it with an understanding.  That's why

5   we're not asking for the top of the guideline, but I would

6   suggest in this particular case it would send the wrong message

7   to this defendant, who is still going to be a young man even if

8   the Court adopts our recommendation, he will still be under 30

9   years of age, have his entire life ahead of him and hopefully

10  this will be the check that he needs to be a more fruitful

11  member of our society after this.  It will be the deterrent

12  that he really needs to get his life on track.

13          So unless there's any questions that the Court has,

14  that is the government's position and that is our request in

15  this case.

16          THE COURT:  No.  I don't have any questions.  Thank

17  you very much.

18          MS. WEBSTER:  Your Honor, may we approach the side

19  bar.

20          THE COURT:  Certainly.  Off the record on this side.

21          MS. WEBSTER:  Please, Your Honor.

22          THE COURT:  Sure.

23      (Off the record discussion held at the bench.)

24          THE COURT:  Ms. Webster, do you want to consult with

25  your client briefly about our conversation and then ...

1           MS. WEBSTER:  Sure.  Thank you.

2        (Consult with client.)

3           MS. WEBSTER:  Thank you, Your Honor.  May we come to

4    the podium as well?

5           THE COURT:  Yes.

6           MS. WEBSTER:  Okay.  Thank you, Your Honor.

7           May I proceed?

8           THE COURT:  Yes.

9           MS. WEBSTER:  Thank you, Your Honor.  Your Honor, I

10   have some initial commentary about this case in that my client

11   is a rapper.  And in preparing for my sentence I read up on hip

12   hop lyrics and how the U.S. government likes to use those to

13   prosecute folks.  There's a huge article regarding a rapper out

14   of New York who just got a sentence in the Southern District of

15   New York.  And I read an article on a professor that talks

16   about how hip hop lyrics are the only genre used by the

17   prosecution so far she could find to use against defendants

18   when they're using some of their intellectual creativity.  So

19   those are just kind of my general commentary to begin with.

20           But my client, I do believe that going on the

21   internet, which is what he did, Googling information from an

22   open source.  Admittedly, he did go to tour at some points.

23   But this is all information that is open to anyone who seeks to

24   find it.  And so at its core, you have a young man who is

25   seeking to escape through his music.  He wants to be viewed as

1   an authentic rapper.  He wants to be viewed authentically about

2   what he's rapping about, which in this case is credit card

3   fraud.

4           Now, I'm not passing judgment on that topic, but I do

5   think that a lot of what he was doing was well within his First

6   Amendment rights.  And clearly, though, the line was crossed

7   when individuals who liked his music were seeking to learn this

8   art of credit card fraud.  I believe the government used the

9   term art or my client when referencing his music, the art.  And

10  really at its core that's what it was.  It was an art that he

11  was using the internet for to gain information and to be

12  believed.  So that people would go and buy his music.

13          Mr. Hardy, the pretrial services officer, noted that

14  he has --

15          THE COURT:  Was it to buy the music or to wire him

16  five or $600 to purchase those starter packs?

17          MS. WEBSTER:  I think there was a mixed bag.

18          THE COURT:  Okay.

19          MS. WEBSTER:  People who really liked it and people

20  who were then moved beyond just liking it and wanting to try to

21  do it.

22          THE COURT:  Um-hmm.

23          MS. WEBSTER:  He has music on Google, Apple Music.

24  And I believe TuneCore.  So it's not as though he's -- I mean,

25  there's a legitimate musical talent there.

1           What's different for me in this fraud case is

2     typically you see someone who is getting the credit cards or

3     selling them and seeking people out to convince them to engage

4     in their fraud.  These listeners sought out my client.  They

5     contacted him.

6           THE COURT:  But doesn't the Instagram say DM, direct

7     message me if you want to purchase this.

8           MS. WEBSTER:  Yes, Your Honor.  But still he was

9     not -- in my view at least he was not singling out individuals.

10    People were free to ignore that, but there were people who

11    sought him out.

12          THE COURT:  Okay.

13          MS. WEBSTER:  And so I --

14          THE DEFENDANT:  That page wasn't mine.

15          THE COURT:  You'll have a chance to speak, Mr. Woods.

16          THE DEFENDANT:  It's people that make hundreds of

17    pages of saying my name, Selfmade Kash, who would try to do the

18    same -- would do that same thing.  I never posted on Twitter

19    saying DM me for -- I never even promoted it.  I never promoted

20    it, you know.

21          THE COURT:  All right.  Well, let's let Ms. Webster

22    finish and then I'll turn to you.  You'll have a chance to

23    speak.

24          MS. WEBSTER:  So, Your Honor, what I am trying to say,

25    perhaps, less inartfully, is I view this as a First Amendment

1  right to express, to explore, to research, to sing and it went
2  over the line.  And in terms of how far it went over the line,
3  this isn't a case where you hear lyrics about, you know,
4  snitches and ditches and things like that that we typically are
5  focused on when we are dealing with the hip hop culture.

6       I looked at those videos or those postings and was not
7  taken aback at all.  It's the hip hop culture.  I mean, it's
8  been going on for years.  Videos, rap videos, it's all about
9  money.  It's all about, you know, this party life.  So he's 26
10 years old and was 24 or 23 at the time and it's, to me, not out
11 of the ordinary for a young individual like him to be posturing
12 like that for music, musical purposes and expression purposes.

13      So it isn't a small amount of fraud, relatively
14 speaking.  I mean, the guideline lost amount I believe, when I
15 looked, goes up to 550 million dollars.

16           THE COURT:  Right.

17           MS. WEBSTER:  So when you're looking at that scale,
18 he's low on the totem pole.  I shouldn't have said that.  He's
19 low on the bottom rung of the --

20           THE COURT:  I appreciate that.

21           MS. WEBSTER:  And so in looking at the nature of the
22 offense, Your Honor, I would like the Court to consider that.
23 I did go into detail about his trauma and what is it like to
24 walk around at 15 having witnessed what he witnessed without
25 any mental health treatment.  I just can't imagine just trying

1    to get up and go on ordinarily after having witnessed a murder.

2            And then taking the very courageous step of testifying

3    in court, when we're all very familiar with the dangers of

4    doing that.  This anti-snitch culture, this don't say anything,

5    keep it to yourself.  That impact on a 15-year-old and how it's

6    continued to impact him through his anxiety has been tremendous

7    on him.

8            I think it's pretty clear on some of the behavior, the

9    16-year-old incident he incurred with the shooting.  I do want

10   to clarify it wasn't another kid he shot.  It was a 23-year-old

11   man.  He was fighting a kid.  That kid went to get the older

12   brother and that's how the incident went down.  It's certainly

13   not trying to minimize it, just clarifying the facts.

14           Your Honor, and then I talked about the loss of his

15   brother.  And I don't want to belabor that.  He does have his

16   family here, his mother, his father, his brother and I don't

17   think it's necessary to continue, but it's just loss after

18   loss.  You're aware of his recent loss with his girlfriend.

19           THE COURT:  Yes.

20           MS. WEBSTER:  Two losses.  So I think, Your Honor, a

21   sentence of incarceration would not be good for him in terms of

22   growing beyond what he's -- what he needs to do.  Because the

23   treatment he's getting in the community would be better than

24   inside based on his mental health issues.

25           Especially the anxiety.  Especially -- I'm in the

1   exaggerating when I say, Your Honor, we get letters from

2   clients after they're incarcerated where you have to prove that

3   you had no parts in telling on anyone else, getting PSRs into

4   the prison, even though they're prohibited, they make it in and

5   people have to turn themselves in to solitary confinement to do

6   their time if you're viewed as someone who has snitched.

7          And though this relates back to him being 15, he's

8   terrified about that.  And even when he's out, fears that

9   someone's going to recognize him.  So when we're looking at

10  this case in its entirety, the relative low amount of fraud

11  kind of counter balanced with the mental health issues and what

12  it would mean to go into -- excuse me, the Bureau of Prisons, I

13  really am imploring the Court to give him a chance to remain on

14  the outside for his treatment.

15         If the Court were to give him probation, the Court

16  still has the full statutory max available to incarcerate him

17  if he does not do what he's supposed to do outside in the

18  community.  I think the alternative request would be a halfway

19  house if the Court wants to further restrict his liberties, but

20  at this point we would respectfully request a probationary

21  sentence with whatever conditions the Court deems necessary.

22         THE COURT:  Okay.  Thank you, Ms. Webster.

23         Mr. Woods, you have an opportunity to speak if you

24  wish to do so, but you're not required to do so.

25         THE DEFENDANT:  Yes, ma'am.  Good morning.

1          THE COURT:  Good morning.

2          THE DEFENDANT:  I first wanted to say that anything

3    that I did, I took responsibility for as a man.  If I didn't do

4    it, I don't take responsibility for it.  Everything I did, I

5    took responsibility for it.  I really don't remember most of

6    the stuff that the prosecutor just said.  But, honestly, I

7    didn't fight the case that I went through when I shot the guy.

8    I pleaded.  I took the time and through that I was still

9    dealing with the guy that had the murder case.  When I was

10   locked up, I had no outlets to rehabilitate because I was so

11   worried about my life.  I had no way to try to think how would

12   I develop my mind if I'm worried about trying to survive.  So,

13   yeah, I fell through the programs that I was in when I was

14   incarcerated.  I couldn't concentrate, honestly.

15          And, okay, yeah, right now I really don't know

16   that -- I take responsibility for what I did.  I didn't see it

17   as being any wrong when I was rapping about it.  Everything led

18   to the series of events.  I just was rapping and it led to

19   people asking me and it led to me going to the internet and

20   trying to find more information.

21          And it also had me thinking about ifs, what ifs, what

22   ifs.  And I wrote a poem about ifs.  The agony of if.  Agony is

23   pain, trauma, anguish.  And I wrote a poem and I just wanted to

24   share it with you real fast.

25          THE COURT:  Sure.

1           THE DEFENDANT:   It was "The Agony of If."

2           If is a word I have learned to despise.

3           If is a word that brings tears to my eyes.

4           I feel like I'm caught between walls of a stone cold

5   cell.

6           I relive my life and on If I dwell.

7           I rest alone with If, night and day.

8           Wanting to change the past but finding no way.

9           In the past if I had been wiser than such a fool.

10          I could have harnessed If and used it as a tool.

11          Sometimes I think if one of y'all had a better life

12   back then.

13          I wouldn't be praying for the mercy of men.

14          Yes, If is a word I could forget.

15          But, ma'am, it only reminds me of all I regret

16          The Agony of If.

17          Thank you.

18          THE COURT:   Thank you, very much.

19          Is there anything further?

20          MS. WEBSTER:   No.   Thank you.

21          THE COURT:   Please be seated.

22          THE COURT:   I'll now turn to the imposition of the

23   sentence.   I'm required by law, 18 U.S.C. code, Section 3553 to

24   fashion a sentence that is sufficient but not greater than

25   necessary to achieve the statutory objectives of sentencing.

1   So I'll go through each of the objectives that are set forth in

2   the law and discuss how I think they apply in your case.

3          Section A one requires that I look at the nature and

4   circumstances of the offense and your personal history and

5   characteristics.  And I agree with Mr. Hatlem that it's a

6   serious offense.  Anytime someone's personal identifying

7   information is used in furtherance of a criminal offense,

8   there's lasting harm to the individual.  It's a good thing here

9   that you were not especially skilled at transmitting this

10  personal identifying information.  But when it is transmitted

11  successfully, it can take years to undo credit reports that

12  reveal items that should not be there.  It can make the

13  difference between getting a line of credit, a credit card and

14  even the ability to get a car loan or a home loan.

15         I agree with Judge Roberts as she set forth in the

16  case that Mr. Haugabook and the prosecutor cited that there is

17  an epidemic of data breaches in our country.  And what I

18  understand, that leads to a treasure trove of data on the dark

19  web where you went to purchase these 16 individuals' data that

20  was used in this case.

21         I'm thankful that that was the extent of it.  That it

22  wasn't actually -- their credit reports were not harmed and

23  they weren't faced with collection officers and so on.  But the

24  idea behind what you're attempting to do is serious.  So I

25  believe it's a serious offense.

1            Turning to your history and characteristics,

2   Mr. Woods, you have faced trauma and challenges that no child

3   or young adult should have to suffer through.  As a very young

4   person I understand your mother was in an accident and was

5   unable to care for you and your siblings.  And on two different

6   occasions you were placed in foster case for approximately a

7   year.

8            And that's a system we know is deeply flawed and can

9   have a lasting and often negative impact on children who are

10  placed within it.  There's the issue of separation from your

11  family.  The impermanent nature of foster care, the disruption

12  of your education and medical care and so much more.  And in

13  this case it happened more than once.

14           Then I saw that at age 15, as was referenced earlier,

15  you witnessed a murder, saw somebody die a violent death in

16  front of your eyes and you took the brave step of testifying in

17  open court about that crime and have faced anxiety and fear of

18  retaliation ever since.  I commend you for your testimony and

19  for assisting in bringing that particular case to justice, as

20  hard as that must have been.

21           Following that experience, you were diagnosed with

22  serious mental health challenges that required hospitalization

23  and apparently led to your involvement with the juvenile

24  offenses that are listed.

25           And then at age 22 your own brother was murdered.

1    And to the family that is here, I'm terribly sorry to
2    learn of that.

3    So as I look through paragraph after paragraph of the
4    presentence report, you faced trauma and losses that can alter
5    the way that our brains function and can lead somebody who is
6    faced with what you faced into a constant state of fight or
7    flight, lack of sleep, inability to care for yourself the way
8    you would be able to if you had not gone through those
9    experiences.

10    And I understand you have a gunshot wound of your own
11    that you carry with you and it serves as a contact reminder of
12    the danger that exists in your life.  So I look at your
13    personal history and characteristics and I think that they
14    weigh heavily in this particular case.

15    Section (a)(2(A) of the law requires that I fashion a
16    sentence that will reflect the seriousness of the offense,
17    promote respect for the law and provide just punishment.  And I
18    want to break that down.  I do think this is a serious offense.
19    The question is what is the appropriate consequence for that.
20    In terms of promoting respect for the law, I turn that back to
21    you.  It will be -- no matter what the sentence is, it will be
22    in your hands whether you choose to try to engage in this crime
23    or any other crime again in the future.

24    So I ask of you that you take this opportunity, all
25    that you have been through with this case, to take a different

1   approach when considering violating the criminal code.

2          Section (a)(2)(B) and (C), these are the hard ones

3   here, because those require me to fashion a sentence that will

4   provided adequate deterrence to criminal conduct that others

5   might consider and, specifically, to protect the public from

6   further crimes that you would contemplate or undertake.

7          And I think this is a tough case in that regard,

8   because you have quite a social media following.  And so you

9   have people who are very interested in knowing whether there is

10  a consequence for credit card fraud.  And so I just say that in

11  some ways that makes it harder, rather than easier, though I

12  agree with Ms. Webster that your social media presence or any

13  other media attention to this is not my business, in a sense,

14  but I'll have more to say about that in a moment.  But suffice

15  it to say that I have given a great deal of thought about

16  deterrence in this case.

17         Section (a)(2)(D) requires that I consider any needed

18  educational or vocational training, medical care and other

19  correctional treatment.

20         I understand you, from our last hearing together, are

21  on a number of very strong medications that I have a letter

22  dated today from Mr. Hardy, your pretrial services officer,

23  indicating that you have followed up and attended the therapy

24  and mental health treatment in at least two occasions in

25  December and January since we were last in a hearing together.

1        So I'm required to look at the kinds of sentences that
2   are available and avoid unwarranted sentencing disparities
3   among defendants with similar records found guilty of similar
4   conduct.
5        The sentencing guidelines are the place to begin that
6   endeavor and that effort, but they're not the end of that
7   process.  Because I am required to look at you as an individual
8   and not just as a number in the system.
9        So in light of that -- and I wanted to mention
10  something else.  Mr. Hatlem mentioned that this is not a
11  violent offense and so on. I take fraud cases very seriously.
12  And often there's an odd way in which I can almost understand
13  how certain violent offenses take place in the heat of the
14  moment.  This is a situation that repeated itself over and
15  over.  So the fact that it's nonviolent doesn't have as big an
16  impact perhaps on my thought process than it might otherwise.
17       So in light of that and pursuant to the Sentencing
18  Reform Act 1984, having considered the guidelines and factors
19  in 18 U.S. Code, Section 3553(a), I hereby sentence you to a
20  term of 36 months of probation and that's on each count to run
21  concurrently, meaning at the same time.
22       So, Mr. Woods, I'm talking to you and you alone.  You
23  caught a break here.  You caught that break for the reasons
24  that I have just set forth, which is that I think that your
25  personal history and characteristics require that you receive

1  care more than you receive punishment.  So you will have a

2  requirement during those three years of probation that you

3  engage, among other things, in 200 hours of community service.

4  So you are sentenced to 200 hours of voluntary work to assist

5  the community that you've have harmed.

6          But also there'll be a whole list of things that

7  you're required to do.  And what I want to make sure is clear

8  to you, if you violate your term of probation, I have available

9  to me to sentence you to the stat -- to what you can be

10  sentenced to.  You can go to prison in this case and you will

11  go to prison in this case if you violate the terms of your

12  probation.

13          Do you understand that?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  Okay.  Now, I also understand that you

16  would like to reside in the Northern District of Ohio.  Are you

17  still interested in that?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  I'm going to tell you something about

20  those judges.  If your supervision is transferred, I don't

21  whether you'll reside there and I'll handle the supervision. I

22  told you you caught a break.  You're not going to catch another

23  break.  So understand me when I say from my eyes and my heart

24  to yours, you have to live by the conditions I'm going to set

25  forth.  So I will include in the judgment that you may reside

1   in the Northern District of Ohio.

2           You will be ordered to pay a special assessment ot

3   $500.  That's mandatory.  It's $100 per count of conviction.

4   And that's due immediately.

5           You -- I will waive -- you do not have to pay a fine

6   or the costs of supervision due to your lack of financial

7   resources.  Mandatory drug testing will be ordered.  And I want

8   to add here, Mr. Woods, that over the course of your pretrial

9   supervision, you had 12 positive tests for marijuana and two

10  positive screens for cocaine.

11          And whether marijuana is recreational or medical or

12  whatever it is, you have had challenges with medication.  And

13  mixing the powerful medications that you're on with marijuana

14  or cocaine or anything else can be very dangerous.  So you will

15  be required to have mandatory drug testing during this

16  three-year period.  Do you understand that?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Okay.  Also, pursuant to law, 34 U.S. Code

19  Section 40702, you're required to cooperate with the collection

20  of a DNA sample as directed by probation.  I'm also including

21  as part of the judgment that you not have any further

22  discussion of credit card fraud or illegal activity on the

23  internet.  And I don't think that that's a First Amendment

24  violation.  Because when you have used the internet to further

25  your crime, it's fair and just and reasonable to -- for the

1    Court to determine that can't continue.  So what I'm telling

2    you, is you cannot use the internet to further credit card

3    fraud or any other illegal activity.

4              While on supervision -- while on probation, you will

5    be required to abide by the standard conditions adopted in the

6    Eastern District of Michigan -- or the Northern District of

7    Ohio, if your supervision is transferred -- and the following

8    special conditions:  Due to your prior substance abuse, mental

9    health and so on, I am ordering that you participate in a

10   substance abuse treatment program and follow the rules and

11   regulations of that program.  The probation officer in

12   consultation with the treatment provider will supervise your

13   participation in such a program, if necessary.  And they'll

14   work with you and your provider to determine if that's

15   necessary.  And that program may have its own testing, but that

16   you still would have to do drug testing with probation.

17             I'm also requiring that you submit to a psychological

18   or psychiatric evaluation as directed by probation, if

19   necessary.  And take all of the mental health medications if

20   they are prescribed by your treating physician.

21             And I think you currently have quite a list of

22   medications you're prescribed.

23             THE DEFENDANT:  Yes, ma'am.

24             THE COURT:  You're also required to participate in

25   ongoing mental health treatment and follow all the rules and

1  regulations of that treatment.  And the probation officer will

2  work with you regarding what ongoing treatment is necessary.

3          Let me ask whether you're interested in any further

4  formal education?  Classroom?  Degree?

5          THE DEFENDANT:  Yes, ma'am.  Everything, actually,

6  that you spoke on is -- that happen in the community is things

7  that I have always been interested in, it's just not having the

8  resources or, you know, like the people to go with me to do it.

9  So I'm actually happy about that.

10          THE COURT:  Good.

11          THE DEFENDANT:  And it wouldn't be a problem, ma'am,

12  with me furthering my education because those are things that I

13  didn't take advantage of when I was younger and I would like to

14  take advantage of now.

15          THE COURT:  You went up through the 10th grade, right?

16          THE DEFENDANT:  Yes, ma'am.

17          THE COURT:  And do you want to get a GED?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  I don't pass judgment if you say you want

20  to do something else, a vocational program or anything at all,

21  I just want to know.  Because I don't want to put a condition

22  in here that either doesn't help you or sets you up for

23  failure.

24          THE DEFENDANT:  Honestly, I'm not familiar with when

25  you said vocational.  So I don't know.

1          THE COURT:  You've done home -- you've assisted family

2     members in the past?

3          THE DEFENDANT:  Yeah.  Yeah.  So you mean like that.

4     Like working and stuff.

5          THE COURT:  Yeah, like carpentry or welding or any of

6     those sorts of things.

7          THE DEFENDANT:  I would think, you know, furthering my

8     education with --

9          THE COURT:  Yeah.  I think it would be really helpful

10    to you in terms of everything.  So I will put that you are

11    required to participate in an educational program and follow

12    that program's rules and regulations.  It might be a high

13    school GED.  There are many other kinds of programs that -- so

14    I will put that you'll do that in consultation with the

15    probation officer so that the two of you can work out what will

16    be most helpful or interesting to you.

17         I'm also ordering that you participate in cognitive

18    behavioral therapy treatment program, which could follow the

19    psychiatric evaluation.  And the probation officer would

20    supervise your participation in that program.

21         Is the government seeking restitution?

22         MR. HATLEM:  I don't believe that there is any

23    restitution owing, Your Honor.

24         THE COURT:  Yeah.  I don't think so.  I mean, these

25    people were ripped off of their five or six hundred dollars,

1   but they were trying to engage in a crime.  So you're not

2   trying to return that?

3          MR. HATLEM:  No.  I guess he gets to enjoy the

4   proceeds of that, Your Honor.

5          THE COURT:  Okay.  All right.  Well, that will

6   constitute your sentence in this case.

7          And Mr. Woods, I fashioned the sentence based on what

8   I have learned about you through the three hearings that we

9   have now had, your forthright conversation with me at the last

10  hearing, the violation of your conditions of pretrial release.

11  And I take all of those conditions very seriously and I know

12  that you will as well.

13         In your guilty plea, you waived or gave up your right

14  to appeal your sentence as long as I sentenced you in

15  accordance with the way your sentence was estimated.  I

16  sentenced you below that.  But if you or your lawyer believe

17  you do have a right or an issue to appeal in your sentence, you

18  must do so within 14 days of entry of the judgment and you can

19  request a lawyer be appointed to assist you with that if you

20  don't have the money to pay for one.

21         Mr. Hatlem, are there any counts that need to be

22  dismissed?  Isn't there a sixth count?

23         MR. HATLEM:  It was a Count Six, Your Honor.

24         THE COURT:  Okay.  So I would grant the government's

25  motion to dismiss that.

37

```
 1              MR. HATLEM:  We would move to dismiss that, Your
 2    Honor.  Thank you.
 3              THE COURT:  So does either the government or
 4    Ms. Webster or Mr. Woods have any objection to the sentence
 5    that has just been pronounced?
 6              MR. HATLEM:  We would object to the sentence, Your
 7    Honor.
 8              THE COURT:  Okay.
 9              MS. WEBSTER:  Your Honor, no objections.
10              THE COURT:  Well, Mr. Woods, I wish you the best and I
11    don't want to see you back here.
12              THE DEFENDANT:  Ma'am, thank you for the opportunity.
13    I will take advantage of the opportunity and not the person
14    that gave it to me.  Thank you.
15              THE COURT:  Okay.  Thank you.
16              MS. WEBSTER:  Your Honor, I think Mr. Woods had a
17    question about the internet.  He can still make --
18              THE COURT:  You can make music.  That's how you make
19    your money.  You can't promote a crime on the internet.
20              THE DEFENDANT:  Yes, ma'am.
21              THE COURT:  Because you are now convicted.  You have a
22    felony conviction here, several of them.  And so there are
23    restrictions that can flow from having committed a crime and
24    the restriction that I'm -- you couldn't do this -- well, maybe
25    you could.  I don't know.
```

1          But as a consequence of the way you did this crime,

2     you can't promote crime on the internet of credit -- credit

3     card fraud is what I'm concerned about.

4          THE DEFENDANT:  Yes, ma'am.  And I understand.  I just

5     couldn't read between the lines of, like, I just got to stop

6     rapping period?

7          THE COURT:  No.  Nope.

8          THE DEFENDANT:  Okay.  I understood.

9          THE COURT:  And I think Ms. Webster makes a very good

10    point that a great deal of country music talks about crime and

11    we don't see people bringing in country music lyrics.

12          So I have another case where I'm facing a motion to

13    introduce rap lyrics as evidence of a crime.  So this is an

14    issue in the criminal justice system that's important and worth

15    paying attention to.  But here you actually did this crime

16    through your -- these songs and so on.  So that's what you

17    can't do, is anymore -- promoting anymore credit card fraud

18    through the internet.

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  Mr. Hatlem?

21          MR. HATLEM:  Thank you, Your Honor.  Would the Court,

22    then, include in that order that he has to take down videos

23    that he has continuously posted and are still up that promote

24    credit card fraud, because otherwise I think that the Court's

25    order is somewhat without meaning seeing as how he's still

1   getting views and garnering views on those that are explicitly

2   explaining how to commit credit card fraud and glorifying it.

3           I don't believe it's a First Amendment issue, Your

4   Honor, if that is what the Court is concerned about.  Because

5   as a YouTube member, he generates revenue off of that.  So he's

6   making money off of these still.  So I don't see the issue with

7   it if the Court is going to go to the extent -- which I

8   wholeheartedly --

9           THE COURT:  See I don't know whether those are the

10  videos that actually furthered this crime or not.

11          MR. HATLEM:  Well, they're on the internet and they

12  talk --

13          THE COURT:  "U.S. versus Selfmade Kash", I listened to

14  that.

15          MR. HATLEM:  Well, that isn't my point.  I'm talking

16  about the videos that he has posted up there with himself

17  fanning out the $50,000.  I mean, they're in our sentencing

18  memorandum.

19          THE COURT:  Yeah.  No.  I saw that.

20          Ms. Webster?

21          MS. WEBSTER:  Your Honor, I guess I would ask for an

22  opportunity to take a look at all of the videos.  I did not

23  review all of them.

24          THE COURT:  I didn't review.  I just reviewed your

25  memo and a smattering of YouTube's.

 1           MS. WEBSTER:  Would the Court like a short position on
 2   whether or not that should be a condition after I had an
 3   opportunity to look at them?
 4           THE COURT:  That would be helpful?
 5           So why don't we ...
 6           I'm going to look at the calendar.
 7       (Pause.)
 8           MR. HATLEM:  Your Honor, if the Court isn't inclined
 9   to grant it -- I mean, I don't want to seem angry about this,
10   but ...
11           THE COURT:  No.
12           MR. HATLEM:  It seems like such a minimal request of a
13   person who has just been given a huge break.  We gave him a
14   break by not imposing the mandatory consecutive sentence.  The
15   court justifiably gave him a break.  That's fine.  But the idea
16   that we're just asking him to take down videos of criminal
17   behavior of him with guns and firearms and he's fighting about
18   that is, frankly, ludicrous.  But if the Court is --
19           THE COURT:  Well, he's not fighting.  His lawyer is
20   wanting to take a look at it.  He hasn't said anything about
21   it.
22           And I have been giving the First Amendment thought
23   from the minute this case showed up.  So I'm not prepared to
24   ask him to take things down that I haven't reviewed.
25           MR. HATLEM:  Okay, Your Honor.

1          THE COURT:  If the government does want to pursue
2    that -- and that's a reasonable request.  I don't think it's
3    unreasonable.
4          We could have briefing by the 31st of this month or
5    the -- two weeks is the 24th.
6          MR. HATLEM:  That's fine.
7          MS. WEBSTER:  That works, Your Honor.
8          THE COURT:  So we'll do the 31st.  And what I would
9    like is links, Mr. Hatlem, to what you want taken down.
10   Because I don't want to issue an order and not know what is
11   coming down and what is not and then be unable to see if it was
12   abided by.
13         MR. HATLEM:  Yes, Your Honor.
14         THE COURT:  So why don't we do this:  By the 24th, the
15   government would identify what you think should be taken down
16   with just a short parenthetical.  "This instructs people on how
17   to engage in credit card fraud and it was used in furtherance
18   of this crime."
19         MR. HATLEM:  And did you say the 24th?
20         THE COURT:  Yeah.  And then Ms. Webster, can you
21   respond by the 31st?
22         MS. WEBSTER:  Yes, Your Honor.
23         THE COURT:  So I will not enter the judgment -- or I
24   could enter it and then have an amended judgment if I add that.
25         Ms. Danish, which is best?

1          PRETRIAL SERVICES REPRESENTATIVE:  The amendment.  If
2     he's looking to move or even provides provision, it's hard to
3     do when a judgment is not expelled.
4          THE COURT:  All right.  So we'll enter judgment as
5     soon as it's prepared and I'm going to amend it if I'm going to
6     add this requirement.
7          MR. HATLEM:  Thank you, Your Honor.
8          MS WEBSTER:  Thank you.
9          THE COURT:  Thank you.
10          THE CLERK OF THE COURT:  Court's in recess.  All rise.
11       (At 12:06 p.m., matter concluded.)
12                              -   -   -

```
 1                C  E  R  T  I  F  I  C  A  T  E

 2

 3          I, Darlene K. May, Official Court Reporter for the

 4   United States District Court, Eastern District of Michigan, do

 5   hereby certify that the foregoing is a true and correct

 6   transcript, to the best of my ability, from the record of

 7   proceedings in the above-entitled matter.  I further certify

 8   that the transcript fees and format comply with those

 9   prescribed by the Court and the Judicial Conference of the

10   United States.

11

12   February 27, 2020          /s/ Darlene K. May
     Date                       Darlene K. May, CSR, RPR, CRR, RMR
13                              Federal Official Court Reporter
                                Michigan License No. 6479
14

15

16

17

18

19

20

21

22

23

24

25
```